Filed 4/23/14  Unmodfied version attached

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PATRICK SCOTT et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>      Defendant and Appellant. | A137975<br><br>(Alameda County<br>Super. Ct. No. RG12613671)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on March 26, 2014, be modified as follows:

1.  On page 15, the fourth sentence in the first full paragraph, beginning, "Further, as noted above," is amended by deleting all text following the word "point."  The amended sentence reads:

> Further, as noted above, the Ford employee whose deposition testimony was presented made this exact rhetorical point.

2.  On page 16, the first full sentence, beginning "While we agree," should be amended by deleting the words "did not object to the line of argument, and" from the middle of the sentence.  The amended sentence reads:

> While we agree the evidence did not support such an argument, Ford had the opportunity to respond to the argument in its own closing.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.2. and II.A.3.

There is no change in the judgment.

The petition for rehearing of appellant and cross-respondent Ford Motor Company is denied.

Dated:

_____

Margulies, Acting P.J.

Trial Court: Alameda County Superior Court

Trial Judge: Hon. George C. Hernandez, Jr.

Counsel:

Kazan, McClain, Satterley, Lyons, Greenwood & Oberman, Joseph D. Satterley, Dianna Lyons, Justin A. Bosl, Ted W. Pelletier, and Michael T. Stewart for Plaintiffs and Appellants Patrick Scott and Sharon Scott.

Nixon Peabody, Ronald Frank Lopez, David A. Pereda, Ross M. Petty; Munger, Tolles & Olson, Daniel P. Collins, Nicholas C. Soltman; Dykema Gossett, and Eric C. Tew for Defendant and Appellant Ford Motor Company.

The Product Liability Advisory Council, Inc., Hugh F. Young, Jr.; Snell & Wilmer and Mary-Christine Sungaila as Amici Curiae on behalf of Defendant and Appellant Ford Motor Company.

Filed 3/26/14 Unmodified version

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PATRICK SCOTT et al., | |
|     Plaintiffs and Appellants, | A137975 |
| v. | |
| FORD MOTOR COMPANY, | (Alameda County |
|     Defendant and Appellant. | Super. Ct. No. RG12613671) |

Plaintiff Patrick Scott (Scott) owned and operated vehicle service stations for over 40 years, during which he was periodically exposed to asbestos from brake and clutch repair. He eventually developed mesothelioma, a form of cancer uniquely linked to asbestos. Scott and his wife Sharon (plaintiffs) filed suit against a wide variety of corporate defendants, alleging several causes of action for negligence and products liability.

The lawsuit ultimately proceeded to trial against only one defendant, Ford Motor Co. (Ford). During plaintiffs' case, the trial court effectively struck plaintiffs' demand for punitive damages, finding Michigan law, which does not permit punitive damages unless specifically authorized by statute, applicable to this issue. The jury rendered a plaintiffs' verdict on the negligence and products liability claims, finding Ford proportionately liable for Scott's disease. Following entry of judgment, Ford unsuccessfully moved for judgment notwithstanding the verdict (JNOV).

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.2. and II.A.3.

Ford raises a number of challenges to the trial court's denial of its JNOV motion, among them that Scott, as a service station owner and mechanic, should have qualified as a "sophisticated user" of automotive parts and must be deemed to have been aware of the risks asbestos exposure from the repair of brakes and clutches. We conclude the sophisticated user doctrine did not constitute a complete defense to plaintiffs' failure to warn claims because Ford failed to prove the risks of automotive asbestos exposure should have been known by mechanics in the 1960's and early 1970's, when Scott began his career. Because we affirm the judgment on the basis of the failure to warn claims, we do not reach Ford's challenges to the other causes of action.

In a cross-appeal, plaintiffs challenge the trial court's decision to invoke Michigan law to strike their demand for punitive damages. Michigan decisional law denies punitive damages on the principle that the award of civil damages for the purpose of punishment, rather than compensation, is inappropriate. Applying California's "governmental interest" conflict of laws analysis, we conclude that Michigan courts have no interest in seeing the application of this principle in the courts of California, which apply a contrary principle in allowing punitive damages. Accordingly, we remand for a new trial on the issue of punitive damages.

## I.  BACKGROUND

Plaintiffs filed suit against more than 30 defendants, among them Ford, alleging Scott, an auto mechanic, had developed mesothelioma from exposure to asbestos in defendants' products. The complaint asserted causes of action for negligence, breach of implied warranty, product liability, fraud, and others. Plaintiffs settled or otherwise resolved their claims against all other defendants, and the case proceeded to jury trial against Ford. The trial was a long one, and we summarize only the evidence directly pertinent to the arguments we consider in this appeal.

### A.  *Scott's Career*

Scott worked as a mechanic for over 40 years. He began working on cars as a young teenager. After he joined the United States Air Force in 1961, he was trained at a technical school and served as a mechanic for four years. After his discharge, he worked

2

for eight months at a shipyard, where he suffered significant exposure to a particularly harmful form of asbestos. With a friend, Scott opened his first service station in 1966. He owned and operated four different service stations over the succeeding years, at one time employing as many as 17 workers. While operating the service stations, Scott became a member of an automotive trade association and earned certification in electrical systems, engine performance, and advanced engine performance from Automotive Service Excellence (ASE), and he received some professional training. In the course of his work, Scott was exposed to asbestos while servicing brakes and clutches supplied by a wide variety of manufacturers and merchants, including Ford.

**B.** *Knowledge of the Risks of Automotive Asbestos Exposure*

Mesothelioma is a cancer of the lining of the lung particularly associated with asbestos exposure. Exposure to asbestos does not cause the immediate appearance of cancer. Instead, the disease has a long latency period; an exposure can result in the development of cancer from 20 to as many as 70 years later. Exposure that occurs earlier in a person's life has greater potential to contribute to the development of mesothelioma than later exposure.

The dangers of asbestos exposure began to be recognized by the scientific community in the late 1920's. Consciousness of the connection to cancer grew during subsequent decades, with the connection firmly established by 1955. The causation of mesothelioma, in particular, by asbestos was recognized by 1960.

This general knowledge did not necessarily translate to the vehicle service industry, however, because the type of asbestos fiber used in the manufacture of auto parts is far less potent in causing harm than other industrial types of asbestos. Awareness grew throughout the 1940's, 1950's, and 1960's that persons who serviced brakes were exposed to asbestos. Plaintiffs' expert testified that by no later than 1964, the type of asbestos fiber used in vehicle brakes and clutches was recognized by the scientific community as causing mesothelioma. Yet Ford's expert testified that the conclusion from a major scientific conference in 1969 was that "brake linings are not a problem—or not a hazard." The publication in the mid-1970's of a further series of scientific studies

3

caused plaintiffs' expert to conclude it had become "well known" in the scientific community that working with brakes exposed workers to dangerous levels of asbestos.[1]

There is little direct information in the record about the degree to which these dangers became known by persons working directly with automobiles, including mechanics like Scott. The Occupational Safety and Health Administration did not begin to regulate exposure to asbestos in the workplace until 1971. Although by the early 1970's, Ford was discussing internally the possible risks of automotive asbestos exposure and exploring ways to minimize it, its service manuals contained no mention of asbestos at that time. The first reference in the record to communications directed at service station workers warning of asbestos exposure is the publication in 1975 of bulletins by the National Institute of Occupational Health and Safety (NIOSH). There is no indication how widely known or distributed these publications were at the time.

The first reference in the record to commercial warnings about exposure to asbestos in the auto industry appears in 1973, when one brake manufacturer began to label cartons containing its products. The same year, the Chrysler Corporation first warned about asbestos exposure in its service manuals. Ford first mentioned asbestos in a "technical service bulletin" in 1975, and General Motors Corporation placed information in its service manuals the following year. Consistent with this, Scott's business partner, also a mechanic, recalled that warnings about asbestos exposure began to appear in the mid-1970's. Prior to that, in the late 1960's and early 1970's, he did not recall receiving any information about asbestos exposure. It was not until at least 1980 that Ford placed warnings on cartons of its replacement brake parts.

C. *Evidence of Ford's Internal Investigation*

As part of their failure to warn and fraud cases, plaintiffs sought the admission of evidence of an internal investigation by Ford of the prevalence of mesothelioma among its employees, apparently begun in the late-1970's and continuing through the early

---

[1] Illustrating the difficulty of pinpointing a scientific consensus regarding the dangers of automotive asbestos exposure, Ford's expert testified that these same studies from the mid-1970's were inconclusive.

1980's. Over Ford's objection, the trial court admitted several documents and related videotaped deposition testimony by a Ford employee. In one handwritten memorandum, a Ford employee appears to have calculated the incidence of mesothelioma cases to be expected in the general population and compared it to the incidence among Ford employees, concluding the incidence at Ford was nearly three times the expected rate. Other documents named some of the Ford workers who had been found to have contracted mesothelioma and, for many of the workers, described their occupations at Ford and their possible military exposure to asbestos, if any. None of the workers appears to have worked directly with brake or clutch assembly or service. During the deposition that was admitted with the documents, plaintiffs' counsel repeatedly attempted to tie the occurrence of these cases of mesothelioma to Ford's use of asbestos-containing brakes. The Ford employee was able to note, on at least three occasions, that none of the employees who contracted mesothelioma was found to have worked with brake installation. The employee also noted that many of the employees had other industrial experience outside Ford.

The trial court declined to exclude the investigation evidence as irrelevant, reasoning the evidence tended to show Ford "knew that its products increased the likelihood that users [would develop] mesothelioma." Having found the evidence relevant, the court rejected a further objection under Evidence Code section 352, noting the Ford employee's testimony was, in part, "helpful" to Ford's position.

## D. *Denial of Punitive Damages*

Late in their case, plaintiffs attempted to introduce Ford's annual report to support their claim for punitive damages. Ford had earlier argued to the trial court that Michigan law should be applied to bar plaintiffs' claim for punitive damages, but the court had declined to rule on the issue. After lengthy argument by the parties, the court accepted Ford's argument, ruling, "Using the government interest analysis, the court concludes that Michigan's interest as embodied in its prohibition of punitive damages would be more impaired if its law were not applied under the circumstances of this case than would

5

California's interest" in allowing a claim for punitive damages. Accordingly, the court ruled the annual report inadmissible and precluded the claim for punitive damages.

The jury returned a special verdict finding Ford liable on theories of failure to warn, design defect, and negligence, but it found no fraud. Ford was found 22 percent liable for Scott's injuries, while Scott was found comparatively responsible for 19 percent. Various other nonparties were assigned responsibility for the remainder, with the largest share, 33 percent, assigned to the United States Navy. Ford moved for JNOV and a new trial, raising, among others, its arguments on this appeal. The motions were summarily denied.

## II. DISCUSSION

### A. *Ford's Appeal*

#### 1. *Sophisticated User Doctrine*

Ford argues it should have been granted judgment notwithstanding the verdict because the "sophisticated user" doctrine provides a complete defense to plaintiffs' failure to warn and "consumer expectations" design defect claims. The trial court instructed the jury on the "sophisticated user" defense, using CACI No. 1244, which required Ford to prove "that, at the time of the injury, [Scott], because of his particular position, training, experience, knowledge, or skill, knew or should have known of the products' risk, harm or danger." Because neither party sought a finding on the sophisticated user defense in the special verdict form, we have no direct indication from the jury of its conclusion about this issue. By rendering a plaintiffs' verdict on the failure to warn claims, however, the jury unequivocally rejected Ford's present assertion of the doctrine as a complete defense to plaintiffs' failure to warn claims.

On appeal from the denial of a JNOV motion, we "review[] the record in order to make an independent determination whether there is any substantial evidence to support the jury's findings." (*Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1284.) "The scope of the review is limited to determining whether there is any substantial evidence, contradicted or not, to support the jury's verdict. [Citation.] Applying the substantial evidence rule, we resolve 'all conflicts in the evidence and all

6

legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict. [Citations.]' [Citation.] Thus, this court must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict. [Citation.] Accordingly, we do not weigh the evidence or judge the credibility of the witnesses. [Citation.] If sufficient evidence supports the verdict, we must uphold the trial court's denial of the JNOV motion." (*Id.* at pp. 1284–1285.)

The sophisticated user defense was adopted by our Supreme Court in *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56 (*American Standard*). In very general terms, it bars strict liability and negligence claims based on the failure to warn about a particular risk in a defendant's product if (1) the plaintiff is shown to be a "sophisticated user" of the product and (2) the general class of similar sophisticated users knew or should have known of the particular risk alleged by the plaintiff at "the time of the plaintiff's injury." (See generally *American Standard*, at pp. 65, 71, 74.)

Substantial evidence exists to support the jury's rejection of the defense in Ford's failure to satisfy the second requirement of *American Standard*—proof that the claimed class of sophisticated users were or should have been aware of the risks associated with professional asbestos exposure throughout the period of Scott's exposure. There was no evidence that Scott, or others like him, were instructed in the claimed risks as part of their training, in contrast to the plaintiff in *American Standard*. (*American Standard, supra,* 43 Cal.4th at p. 62 [discussion of the risks the plaintiff asserted in the litigation contained in the standard industry training manual].) On the contrary, the nature of the risks of automotive asbestos exposure had not even become clear to the scientific community when Scott opened his first service station. Based on the evidence presented at trial, the earliest possible dates from which constructive knowledge of those risks could be attributed to the general community of service station owners are 1973, when the first brake manufacturer placed a warning on its cartons and Chrysler warned in its service manual, or 1975, at the time of the NIOSH publications. Further, it could easily be argued that these scattered examples of notice are not evidence of the type of industry

7

recognition necessary to impute knowledge to individual participants under the sophisticated user doctrine. As noted, Ford did not begin to place a warning on its cartons of brake parts until 1980, suggesting the industry consensus continued to form throughout the second half of the 1970's.

This is significant because, under *American Standard*, the constructive knowledge of sophisticated users is to be measured at "the time of the plaintiff's injury." (*American Standard, supra,* 43 Cal.4th at p. 74.) Because of the cumulative effects of asbestos exposure, it is impossible to pinpoint a single time at which Scott was "injured" by asbestos. As plaintiffs' expert testified, the time between exposure to asbestos and the appearance of the disease can be many decades, and earlier exposure is more likely to contribute to disease than later exposure. In the absence of evidence suggesting otherwise, Scott must be presumed to have been in the process of being injured by asbestos throughout his career, and the exposure that occurred earlier in his career weighs more heavily.[2] As a result, in order for the sophisticated user doctrine to provide a complete defense to plaintiffs' claims, Ford was required to show that service station owners knew or should have known of the risks of vehicle repair exposure to asbestos from the mid-1960's on. For the reasons discussed above, there is no such evidence for the first decade of Scott's career, at a minimum.

Ford argues "the undisputed evidence . . . demonstrated that, throughout the relevant time period, there was widely disseminated publicly available information that brakes contained asbestos, that asbestos presented health risks, and that brakes therefore might present a potential risk." By failing to distinguish among types of asbestos, this greatly overstates the evidence as it relates to the risks of automotive asbestos exposure. From 1966, the beginning of the relevant time period, there appears to have been a scientific consensus that industrial exposure to the type of asbestos used in insulation was dangerous. There was no similar consensus about exposure to asbestos through

_____

[2] By finding the United States Navy 33 percent responsible for Scott's injury, the jury implicitly attributed a portion of his disease to his work at the shipyard, which preceded most his automotive exposure to asbestos.

8

automotive work, given the far less potent type of asbestos involved. Ford's own expert testified as much. While it was certainly possible to *speculate* on the basis of available information that automotive exposure to asbestos carried risk, thereby supporting Ford's contention that "brakes therefore *might* present a *potential* risk" (italics added), speculation about a risk does not give rise to constructive *knowledge* of a risk under the "should have known" test. The jury was not required to find Scott "should have known" of a risk about which even specialists had not yet reached agreement.[3]

Ford bases its argument that sophisticated users should be deemed to have constructive knowledge of speculative dangers on the Supreme Court's references in *American Standard* to users' knowledge of the "potential" dangers of a product. (E.g., *American Standard, supra,* 43 Cal.4th at p. 65.) Most industrial dangers are, of course, "potential." Explosives are dangerous, but the danger is not realized—i.e., is "potential"—unless they are mishandled. The *American Standard* court's references to "potential" dangers throughout the decision demonstrate it was referring to this type of known but contingent danger, rather than the unproven and merely speculative dangers to which Ford refers. For example, the court referred to the "potential hazards of [welding chemical] exposure," which were well known within the industry at the relevant time, and the "potential harms associated with firing a pellet gun," which the court deemed to be "obvious." (*Id.* at pp. 62, 67.)

We note that by finding Scott contributorily negligent in causing his injury, the jury likely concluded that at some point in his career, Scott should have become aware of the dangers of asbestos exposure and taken action to protect himself. Our conclusion that

---

[3] Ford also appears to argue Scott should have known of the risks of asbestos exposure from the start of his work as a mechanic because he was aware coworkers at the shipyard developed asbestosis. The two situations are sufficiently different that the knowledge cannot be deemed transferrable, at least as a matter of law. That workers with relatively heavy and constant exposure to one type of asbestos fiber develop asbestosis does not necessarily mean that workers with intermittent, lower level exposure to a different type of asbestos fiber will also be adversely affected, particularly by an entirely different disease.

9

Ford failed to prove the type of constructive knowledge that would entitle it to invoke the sophisticated user doctrine as a *complete* defense to Scott's failure to warn claims is not inconsistent with the jury's probable conclusion on this issue.

Finally, we note that counsel for Ford suggested for the first time at oral argument that if Scott was not a sophisticated user, then Ford had no duty to warn about the risks of asbestos exposure in its brakes. Although counsel did not fully articulate this argument, he appeared to be suggesting that if Scott is not deemed to have known of the risks of asbestos exposure from automotive brakes, then Ford could not be deemed to have sufficient knowledge of those risks to trigger a duty to warn. The contention fails, at least as a matter of law, because the standards for constructive knowledge are different. While the precise contours of the sophisticated user defense have yet to be worked out, Scott's constructive knowledge is judged by, at most, the information reasonably available to him as a local mechanic or, as Ford argues, a local employer of mechanics.[4] That is unlikely to have included every nook and cranny of the scientific and medical literature. Ford, in contrast, had a duty to warn of risks that were " 'known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.' " (*Coleman v. Medtronic, Inc.* (2014) 223 Cal.App.4th 413, 428.) Determining what was " 'known or knowable' " to Ford requires an evaluation not merely of the information reasonably available to a local automotive business, like Scott's, but also the best available scientific knowledge and Ford's own knowledge, public or not, as a large international business directly involved in the manufacture of the product under discussion. Whether these two sets of knowledge were the same here is a question of fact, not of law, but there is no reason to

---

[4] At oral argument, Ford emphasized Scott's status as an employer, suggesting this status placed on him a greater degree of awareness than is required of a non-employer. We do not reach this issue because, as discussed above, we conclude there was substantial evidence to support a finding that no one in the automotive mechanic business, whether employer or otherwise, was deemed to have known that exposure to automotive asbestos presented a serious health risk during at least the first few years of Scott's career.

assume they were. We decline to engage in any further factual review of the issue because Ford raised the argument for the first time at oral argument, without providing proper briefing or an opportunity for plaintiffs to respond.

Because we find Ford failed to demonstrate the sophisticated user doctrine provides a complete defense to plaintiffs' failure to warn claims, we need not address its further contention the trial court erred in refusing to apply the defense to Scott's consumer expectation design defect cause of action. Even if the defense is applicable to the consumer expectation test, Ford's failure to prove the defense precludes reversal of the JNOV denial on this ground. We also decline to address in further detail Ford's claim that, wholly apart from the sophisticated user defense, the "relevant class of consumers" knew or should have known of the dangers of asbestos exposure. For the same reasons discussed above, the argument is not supported by the evidence.

## 2. *Efficacy of a Warning*

Ford also argues it should have been granted JNOV on the failure to warn claims because there was no evidence demonstrating a warning would have prevented Scott's exposure to asbestos in Ford products. The argument is premised on Ford's contention there was no evidence to suggest "the presence of a warning would have caused Scott to alter his behavior in such a way as to avoid the harm," since "the evidence overwhelmingly shows that, during the relevant time period, Scott was oblivious to, and ignored, all warnings made available to him."[5]

---

[5] While we entertain this argument, we have some doubts about its legal validity. The premise of Ford's argument, that a defendant's failure to warn must be a proximate cause of the plaintiff's injury, is certainly correct. (*Conte v. Wyeth, Inc.* (2008) 168 Cal.App.4th 89, 112.) The sole case cited by Ford finding that an absent warning was not a proximate cause of injury, however, was based on the impracticality of effectively communicating a warning, not on the plaintiff's likely resistance to it. (*Huitt v. Southern California Gas Co.* (2010) 188 Cal.App.4th 1586, 1604.) It risks undercutting the policy underpinnings of product liability law to allow a defendant to argue it was excused from liability for its failure to warn because the plaintiff was unlikely to have conformed his or her conduct in accordance with the warning.

Substantial evidence supports the jury's finding that a timely warning to Scott could have prevented harmful exposure. Scott was described by a former employee at his service station as safety conscious, and other former employees described safety precautions he followed in his business. He testified he did not recall ever seeing a warning regarding the dangers of vehicle-related asbestos exposure. The jury was entitled to infer that, had he become aware of the risks of automotive asbestos exposure, he would have taken appropriate precautions.

Ford argues the jury should have found Scott immune to safety warnings about asbestos because (1) he took no protective action while working at the shipyard, despite being aware a fellow worker had developed asbestosis and wore a mask for protection from further exposure; and (2) he could not recall ever having seen any warnings about vehicle-related asbestos exposure, despite an overwhelming amount of information on the subject available over the years, including warnings on other, similar products. While Scott's insensibility to warnings is an inference that could be drawn from these circumstances, the jury was not *required* to draw that inference. The nature and duration of Scott's asbestos exposure at the shipyard was not comparable to his exposure during his career as a mechanic. It therefore provides a limited basis for comparison. As to the second argument, the jury could have concluded Scott would have been more susceptible to an appropriate warning earlier in his career, when Ford failed to provide one. In any event, this was a judgment of fact properly left to the jury.

Because we conclude there is no basis for overturning the jury's verdict on the failure to warn claims, we need not address Ford's argument it should have been granted JNOV on plaintiffs' other claims. Their success on the failure to warn claims fully supports the judgment.

12

### 3. *The Internal Investigation Documents*

Ford contends the evidence regarding its internal investigation of mesothelioma deaths should have been excluded as irrelevant or as more prejudicial than probative.[6]

Evidence is relevant if it has " 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Jones* (2013) 57 Cal.4th 899, 947.) Even relevant evidence can be excluded under Evidence Code section 352 if " 'its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome [citation].' " ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 713.) " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant . . . and which has very little effect on the issues." ' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059.) We review the trial court's decision to admit evidence for abuse of discretion. (*Ibid.*)

We find no abuse of discretion in the trial court's conclusion that the investigation evidence was relevant. As part of their failure to warn case, plaintiffs were required to

---

[6] It is not entirely clear what evidence is the subject of Ford's appellate argument. In the introduction to this argument in its opening brief, Ford claims it is concerned with the admission of "documents and deposition testimony that identified Ford employees who reportedly died of mesothelioma," which evidence it defines as the "employee list." Yet on the next page of the brief, Ford states that "[t]he 'employee list' is actually four exhibits that were admitted into evidence and published to the jury . . . , as well as the related video deposition testimony of Ford's corporate representative . . . ." This explanation encompasses virtually all of the investigation evidence, rather than the simple listing of employee names Ford initially defined as the "employee list." We take the second, more comprehensive definition to state the scope of Ford's appellate argument and consider the investigation evidence as a whole, rather than limiting our consideration to the lists of Ford employee names.

13

prove Ford was aware exposure to asbestos in Ford products presented a health risk. The investigation evidence demonstrated both Ford was sufficiently aware of the dangers of asbestos to have instigated an internal investigation into the possibility of asbestos disease among its own employees and Ford employees were three times more likely than the public at large to have contracted mesothelioma, a disease uniquely linked to asbestos exposure. The greater-than-expected prevalence of an asbestos-linked disease gave Ford reason to suspect exposure to asbestos in its products or its manufacturing operations created a higher level of risk.

In finding the evidence relevant, we do not rely on the trial court's reasoning that admission was justified under the "substantially similar" rationale of *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, disapproved on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574, 580. In that *Hasson*, evidence of a design defect in the 1965 version of Ford's brakes was admitted to prove the same defect in the 1966 version of the brakes because the brake design and the reason for failure were "substantially similar." (*Id.* at p. 404.) Because, as Ford argues, there was no evidence exposure to asbestos in brake- or clutch-related operations was the cause of mesothelioma among any of the Ford workers, it is difficult to argue the reported mesothelioma cases were substantially similar to Scott's disease in the manner found probative in *Hasson.* (See, e.g., *Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, 1371–1372.) Nonetheless, for the reason stated above, the evidence was relevant to plaintiffs' case. We are not required to affirm the trial court's reasoning in order to affirm its ruling. (*People v. Cowan* (2010) 50 Cal.4th 401, 473, fn. 25 [" ' "we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm" ' "].)

Admission of the evidence over Ford's Evidence Code section 352 objection is a closer call. While the evidence was relevant to plaintiffs' case, it was by no means critical. The issues of which it was probative, knowledge and notice, were supported by a large amount of other evidence. Further, the investigation evidence carried a risk of confusion and undue consumption of time. While none of the deaths found by Ford was proven to have been related to on-the-job exposure to asbestos through brake or clutch

14

operations, there was a risk the jury could have mistakenly understood the greater prevalence of asbestos-related disease to have been probative on the issue of the causation of Scott's illness. To have wholly eliminated this confusion would have required Ford to present further evidence regarding each mesothelioma victim's personal circumstances, unnecessarily burdening the record.

We decline to decide whether the trial court abused its discretion in overruling Ford's Evidence Code section 352 objection because we conclude the investigation evidence was not prejudicial under the test of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which permits reversal due to the erroneous admission of evidence "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) The investigation evidence was not inherently prejudicial. While, as stated above, it was subject to a *risk* of misunderstanding, the documents themselves made clear that none of the employees who contracted mesothelioma had worked directly in brake or clutch operations. Further, as noted above, the Ford employee whose deposition testimony was presented made this exact rhetorical point on three different occasions, informing the jury at one point that "these individuals were not brake mechanics that are in this production [*sic*], and so there is really no link between these employees and brake work at Ford Motor Company." As the trial court noted, this significantly mitigated the risk of misunderstanding. In any event, there was a substantial quantity of other, more pertinent evidence regarding the relationship between brake- and clutch-related asbestos exposure and disease and Ford's knowledge of this connection. There is no significant likelihood that admission of this evidence resulted in a less favorable verdict for Ford.

Ford notes plaintiffs' counsel used this evidence in closing argument to suggest Ford was aware its employees were dying of mesothelioma due to workplace exposure,

based on mere speculation about the nature and cause of the employees' exposure.[7] While we agree the evidence did not support such an argument, Ford did not object to the line of argument, and it had the opportunity to respond to the argument in its own closing. More importantly, as noted above, there was substantial other evidence unrelated to the investigation evidence from which the jury could have concluded automotive asbestos exposure posed risks and Ford was aware of these risks. Plaintiffs' attorney's misuse of the investigation evidence in closing argument was not prejudicial in the manner required by *Watson.*

**B.** *Plaintiffs' Appeal*

Plaintiffs contend the trial court erred in applying Michigan law to bar their claim for punitive damages. We agree.

California's "governmental interest analysis" for resolving conflicts of law was described most recently in *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191 (*Sullivan*). "We typically summarize governmental interest analysis as involving three steps: 'First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation], and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied." ' " (*Id.* at p. 1202.) Because this is an issue

---

[7] For example, plaintiffs' attorney argued the investigation documents showed Ford "know[s] that asbestos is causing people to die, and they decide to keep on using the product," despite the attorney's acknowledgment moments later it was not known whether any of the cases of mesothelioma was actually associated with brake work.

of law, we review the trial court's decision de novo.  (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274.)

There is little doubt the asserted conflict of law exists; at least, no one contends differently.  Punitive damages may not be awarded as a tort remedy in Michigan.  (*Burns v. Van Laan* (1962) 367 Mich. 485 [116 N.W.2d 873, 877].)  The unavailability of punitive damages in tort actions is an application of the more general rule that, unless expressly allowed by statute, Michigan courts do not permit the award of damages whose purpose is to punish defendants.  (*McAuley v. GMC* (1998) 457 Mich. 513 [578 N.W.2d 282, 285–286 & fn. 8], disapproved on other grounds in *Rafferty v. Markovitz* (1999) 461 Mich. 265 [602 N.W.2d 367, 370 & fn. 6].)  Michigan courts do allow the award of "exemplary" damages, which " 'compensate[] a plaintiff for the "humiliation, sense of outrage, and indignity" resulting from injuries "maliciously, wilfully and wantonly" inflicted by the defendant,' " but *punitive* damages based on the same conduct are unavailable.  (*Birkenshaw v. Detroit* (1981) 110 Mich.App. 500 [313 N.W.2d 334, 339].)  Even the award of exemplary damages, however, has been restricted as actual damages have evolved to include compensation for the type of mental distress formerly covered by exemplary damages.  (*Eide v. Kelsey-Hayes Co.* (1988) 431 Mich. 26 [427 N.W.2d 488, 498–500] (conc. & dis. opn. of Griffin, J.); *Veselenak v. Smith* (1982) 414 Mich. 567 [327 N.W.2d 261, 264].)

In contrast, California courts, pursuant to statute, allow the award of punitive damages in tort actions.  (Civ. Code, § 3294, subd. (a).)  Underlining the direct conflict between the policies of the two states, California courts acknowledge " '[p]unitive damages . . . are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct.' " (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1046.)  "California law has long endorsed the use of

17

punitive damages to deter continuation or imitation of a corporation's course of wrongful conduct."[8]  (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1207.)

Recognizing the conflict, we proceed to the second step of the governmental interests analysis, to examine " 'each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.' " (*Sullivan, supra,* 51 Cal.4th at p. 1202.)  To assess " 'whether either or both states have an interest in applying their policy to the case,' " we "examine the governmental policies underlying [each state's] laws." (*Offshore Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157, 163.)  In doing so, " 'we may make our own determination of [the relevant] policies and interests, without taking "evidence" as such on the matter.' " (*Sullivan,* at p. 1203.)

The Michigan prohibition on punitive damages is premised on a simple principle of public policy:  damages awarded by civil courts are appropriate to compensate, but not to punish. (*Association Research & Development Corp. v. CNA Financial Corp.* (1983) 123 Mich.App. 162 [333 N.W.2d 206, 210].)  The policy was established in two Michigan Supreme Court decisions dating to 1884, *Watson v. Watson* (1884) 53 Mich. 168 [18 N.W. 605] and *Stilson v. Gibbs* (1884) 53 Mich. 280 [18 N.W. 815].  (See *Veselenak v. Smith, supra*, 327 N.W.2d 261, 264.)  As the court explained in *Watson v. Watson*, which ruled inadmissible evidence of a defendant's financial resources in a suit for wrongful seduction, "the measure of [a plaintiff's] redress ought not to depend on a circumstance unimportant to the injury. . . . The anomaly, that a jury may have liberty to punish at discretion for a tort, when, if the act were a crime, the penalty would be carefully limited by law, and that they may award the penalty they agree upon to a private

---

[8] In introducing this topic, we stated there is "little doubt" a conflict of law exists. We qualified the statement because Michigan common law allows punitive damages if authorized by statute, and punitive damages are authorized by statute in California.  It could therefore be argued that punitive damages would be permitted in this case even under Michigan law.  Because plaintiffs do not make this argument, we do not explore it further, but it illustrates one of the difficulties associated with the narrow importation of Michigan law advocated by Ford.

18

suitor to swell his actual damages, has never received much countenance in this State. Compensation for the wrong done has always been held to be the object to be attained; and while all circumstances of aggravation have been received in evidence, the reception has been for the very sufficient reason that the injury to the plaintiff was the greater in consequence thereof, and that his compensation ought to be in proportion." (*Id.* at p. 609.) The logic was echoed in *Stilson,* in which the court disapproved a jury instruction suggesting damages could be awarded to punish the defendant: "The purpose of an action for tort is to recover the damages which the plaintiff has sustained from an injury done him by the defendant. In some cases the damages are incapable of pecuniary estimation; and the court performs its duty in submitting all the facts to the jury, and leaving them to estimate the plaintiff's damages as best they may under all the circumstances. In other cases there may be a partial estimate of damages by a money standard, but the invasion of the plaintiff's rights has been accompanied by circumstances of peculiar aggravation, which are calculated to vex and annoy the plaintiff and cause him to suffer much beyond what he would suffer from the pecuniary loss. Here it is manifestly proper that the jury should estimate the damages with the aggravating circumstances in mind, and that they should endeavor fairly to compensate the plaintiff for the wrong he has suffered. But in all cases it is to be distinctly borne in mind that compensation to the plaintiff is the purpose in view, and any instruction which is calculated to lead them to suppose that besides compensating the plaintiff they may punish the defendant is erroneous." (*Stilson, supra*, 18 N.W. at p. 817.) We have found no Michigan decision articulating any other or different rationale for the disallowance of punitive damages in the state's courts.[9]

---

[9] Although some federal trial courts have attributed a pro-business economic motive to Michigan's prohibition of punitive damages (e.g., *In re Disaster at Detroit Metro. Airport* (E.D.Mich. 1989) 750 F.Supp. 793, 806), no Michigan court has ever articulated this rationale, at least to our knowledge. (See *Kelly v. Ford Motor Co.* (E.D.Pa. 1996) 933 F.Supp. 465, 468 [acknowledging that no Michigan case has actually expressed an economic rationale for the ban on punitive damages].)

Given this rationale, we have difficulty pinpointing any interest of Michigan in the application of its law to this dispute.  While all conflicts of law are, at bottom, conflicts of public policy between judicial systems, the prominence of the debate over punitive damages highlights that aspect of the conflict here.  Reasonable states can and do differ over the efficacy and appropriateness of punitive damages as a civil remedy.  Michigan's ban on punitive damages is the expression of a particular view of the appropriate role of the courts in adjudicating civil disputes:  to compensate, rather than to punish.  It represents a declaration of public policy about the wisdom of granting punitive damages as a legal remedy for noncriminal conduct.  In California, our Legislature has resolved the debate in precisely the opposite manner.  While Michigan has a strong interest in seeing its view of the appropriate policy carried out in its own courts, it has a correspondingly minimal interest in seeing the same policy implemented in the courts of California.

Ford argues we should set aside the judgment of the California Legislature and import Michigan's policy because the conduct underlying its failure to warn occurred in Michigan on behalf of a corporation domiciled in that state.  Because the same argument would hold in all 40-odd other states permitting punitive damages, Ford effectively argues it should be found to carry a nationwide shield from punitive damage liability because the state in which it maintains its headquarters has decided punitive damages are poor public policy.  We cannot agree, any more than we expect a Michigan court would yield to a plaintiff's plea to impose punitive damages on a California-based corporation because its home state has made the opposite policy judgment.[10]  On a matter of public policy as significant as the imposition of punitive damages, states have the prerogative to

_____

[10] When asked to follow the example of a sister state in allowing punitive damages, the Michigan Supreme Court commented, "So far, [except] when the legislature ordains otherwise . . . , the policy of Michigan's law of damages in negligence cases has been compensation—not punishment. . . . So if Georgia permits recovery of punitive damages in negligence cases, so Georgia has that right; yet we liking our own policy of compensatory damages need not follow her guide." (*Burns v. Van Laan* (1962) 367 Mich. 485 [116 N.W.2d 873, 877, fn. omitted].)

20

establish a uniform rule applicable to all enterprises that elect to do business there, but they have no legitimate interest in imposing that policy decision on the courts of a sister state. (*Sullivan, supra,* 51 Cal.4th at p. 1205.)

In an effort to justify its invocation of the state's policy, Ford claims Michigan has an interest in protecting " 'Michigan-domiciled defendants from excessive financial liability,' " citing the conclusion of federal district courts. (*Kelly v. Ford Motor Co.*, *supra*, 933 F.Supp. 465, 468; see similarly *In re Disaster at Detroit Metro. Airport, supra*, 750 F.Supp. 793, 805–806.) With due respect to those courts, that is manifestly not the purpose of the punitive damages ban as it is implemented in Michigan, nor is it an interest that has ever been articulated by Michigan courts. The Michigan ban on punitive damages applies equally to all defendants, regardless of their state of domicile. As a result, "Michigan-domiciled defendants" are provided no more protection from punitive damages in Michigan courts than persons and corporations resident elsewhere.

In *McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, the Supreme Court cautioned against assuming the interest of a state in enforcing laws that are domicile-neutral is restricted to promoting the well-being of its own businesses: "When a state adopts a rule of law limiting liability for commercial activity conducted within the state in order to provide what the state perceives is fair treatment to, and an appropriate incentive for, business enterprises, we believe that the state ordinarily has an interest in having that policy of limited liability applied to out-of-state companies that conduct business in the state, as well as to businesses incorporated or headquartered within the state. . . . In the absence of any explicit indication that a jurisdiction's 'business friendly' statute or rule of law is intended to apply only to businesses incorporated or headquartered in that jurisdiction (or that have some other designated relationship with the state—for example, to those entities licensed by the state), as a practical and realistic matter the state's interest in having that law applied to the activities of out-of-state companies within the jurisdiction is equal to its interest in the application of the law to comparable activities engaged in by local businesses situated within the jurisdiction." (*Id.* at pp. 91–92.)

21

Even if Michigan had expressed an intent to protect its resident businesses from punitive damages, the state would have no legitimate interest in imposing that intent in California. A somewhat similar situation was considered in *Sullivan, supra*, 51 Cal.4th 1191, which rejected the application of the labor laws of other states to work performed in California. The *Sullivan* plaintiffs were employees of Oracle, a corporation headquartered in California, but they resided in Colorado and Arizona. Their job for Oracle required them to travel for work in several states, including California. (*Id.* at p. 1195.) The plaintiffs claimed that while working in California they were required to be paid pursuant to the overtime laws of California; Oracle contended their compensation should be governed by the overtime laws of their home states, regardless of the site of their work. (*Ibid.*) Responding to Oracle's argument that Colorado and Arizona "have an interest in shielding their own businesses from more costly and burdensome regulatory environments in other states," the court held, "We do not doubt the premise that a state can properly choose to create a business-friendly environment within its own boundaries. '[T]he federal system contemplates that individual states may adopt distinct policies to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state.' [Citation.] However, *every* state enjoys the same power in this respect. Therefore, '[i]t follows from this basic characteristic of our federal system that, at least as a general matter, a company that conducts business in numerous states ordinarily is required to make itself aware of and comply with the law of a state in which it chooses to do business.' [Citation.] The federal Constitution does not require a state ' "to substitute for its own [laws], applicable to persons and events within it, the conflicting statute of another state" ' [citation] or permit one state to project its regulatory regime into the jurisdiction of another state [citation]. Consequently, neither Colorado nor Arizona has a legitimate interest in shielding Oracle from the requirements of California wage law as to work performed here." (*Id.* at p. 1205.) For the same reasons, Michigan has no interest in shielding its resident corporations from punitive damages when those corporations chose to do business in states permitting the imposition of such damages.

22

Ford also argues Michigan has an interest in regulating the legal consequences of conduct that occurs within its borders.[11]  In Ford's telling, the Michigan ban on punitive damages represents a declaration that corporate conduct occurring in Michigan should not be subject to punitive damages, regardless of its nature.  That argument, however, suffers from a similar weakness.  Michigan has never articulated this as a motive for banning punitive damages, and Michigan courts do not preclude punitive damages based on conduct occurring only within the state.  Rather, the ban on punitive damages is entirely independent of the location of the alleged conduct in connection with which punitive damages are sought and applies to any defendant's conduct, regardless of where it occurred.

Because we find no Michigan interest in the implementation of its policy in the courts of California, no "true" conflict of law exists.  We therefore need not proceed to the third step of the governmental interests analysis, the relative impairment of interests. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 920.)

Plaintiffs were entitled to present their demand for punitive damages to the jury, in compliance with California law.  Because the trial court declined to permit adjudication of punitive damages, we must remand for a trial limited to that issue.  (See *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 776; *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912–913.)

### III.  DISPOSITION

The judgment of liability and award of compensatory damages against Ford is

---

[11] The decisions when and whether to place a warning on Ford's parts were presumably made by executives located in Michigan, although, of course, the relevant supply of unlabeled products occurred here in California.

affirmed.  The matter is remanded to the trial court for a trial on liability and amount, if any, of punitive damages.

 

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Becton, J.[*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. George C. Hernandez, Jr.

Counsel:

Kazan, McClain, Satterley, Lyons, Greenwood & Oberman, Joseph D. Satterley, Dianna Lyons, Justin A. Bosl, Ted W. Pelletier, and Michael T. Stewart for Plaintiffs and Appellants Patrick Scott and Sharon Scott.

Nixon Peabody, Ronald Frank Lopez, David A. Pereda, Ross M. Petty; Munger, Tolles & Olson, Daniel P. Collins, Nicholas C. Soltman; Dykema Gossett, and Eric C. Tew for Defendant and Appellant Ford Motor Company.

The Product Liability Advisory Council, Inc., Hugh F. Young, Jr.; Snell & Wilmer and Mary-Christine Sungaila as Amici Curiae on behalf of Defendant and Appellant Ford Motor Company.