Filed 1/18/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| HAIRU CHEN et al., | B265304 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC469935) |
| v. | |
| L.A. TRUCK CENTERS, LLC, | |
| Defendant and Respondent. | |

---

APPEAL from a judgment of the Superior Court of Los Angeles County.  J. Stephen Czulegar, Judge; Holly E. Kendig, Judge.  Reversed.

Law Offices of Martin N. Buchanan; Girardi & Keese and David R. Lira for Plaintiffs and Appellants.

Shook, Hardy & Bacon, Frank C. Rothrock and Douglas W. Robinson for Defendant and Respondent.

---

Plaintiffs, Chinese nationals, brought suit against a California tour bus distributor, seeking to recover in strict products liability for injuries and deaths suffered in a bus rollover accident occurring in Arizona. The trial court applied Indiana law, which is substantially less favorable to plaintiffs than is California law, because the tour bus had been manufactured in Indiana, by an Indiana manufacturer who had previously settled out of the case. We conclude the trial court erred in its application of Indiana law, and therefore reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Accident*

Plaintiffs are the passengers who were injured, and the survivors of the passengers who were killed, in a tour bus rollover accident which occurred in Arizona as they were travelling from their hotel in Las Vegas to the Grand Canyon for a day trip. There were 10 passengers, all Chinese nationals on holiday in the United States. The tour was provided by TBE International, Inc., a California tour company. The bus was driven by Zhi Lu, a California resident, who had driven the bus from Los Angeles to Las Vegas, in order to pick up the passengers for their Grand Canyon tour.

That driver Lu was responsible for the accident is not disputed. Lu drove the bus around a curve with an advisory speed limit of 35 miles per hour. He instead took the curve at around 55 miles per hour, and lost control of the bus. The bus left the roadway and rolled over twice. The two front seats of the bus, for the driver and tour guide, had three-point seatbelts (lap and shoulder restraints). The driver and tour guide had been wearing their seatbelts and were virtually uninjured in the accident. The passengers, who had no seat belts at all, fared much worse. One passenger was killed when she was impaled on the door mechanism. A second passenger was ejected from the bus and fatally fractured his skull. Six other passengers were totally ejected from the bus during the roll sequence and sustained injuries. The remaining two passengers, who were not ejected, were nonetheless injured in the rollover.

2.    *The Bus*

Plaintiffs' theory of the case, supported by expert testimony, was that passenger seatbelts would have prevented the deaths and greatly lessened the injuries suffered. Indeed, even the defense expert agreed that the primary factor in reducing the risk of ejection in a rollover accident is a seatbelt.

The bus had been manufactured in Indiana by an entity known as Starcraft.[1] Starcraft did not build tour buses from the ground up; instead, it purchased existing chassis from other manufacturers, and built tour buses on top of them. In this case, a Ford chassis was used.

Starcraft sold its buses nationally, through a network of dealers. L.A. Truck Centers, doing business as Buswest, the respondent in this appeal, was Starcraft's dealer in four western states, including California. Buswest has its principal place of business in California, and describes itself as a California resident. It was the exclusive dealer of Starcraft buses in California. Pursuant to its written agreement with Starcraft, Buswest was obligated to sell at least 72 Starcraft buses per year in California. Buswest also agreed to keep an inventory of at least eight Starcraft buses at all times.

While Buswest could order a custom bus for one of its customers from Starcraft, the tour bus in question had been ordered instead for Buswest's general stock. In September 2005, Buswest ordered a 14-passenger Starcraft bus. Buswest paid Ford for the chassis, and separately paid Starcraft $17,540 for the conversion into a tour bus. When Buswest ordered the bus, it could select among various options. Among its options were seat belts. Buswest could have purchased non-retractable passenger lap belts for the bus for $12 each. It also could have ordered retractable passenger lap and shoulder belts for $45 each.

---

[1]    Eventually, Starcraft was purchased by Forest River, Inc., which was also named as a defendant. When Starcraft ultimately settled with plaintiffs, Forest River did as well. Because the buses are known as Starcraft buses, we use that name to refer to the manufacturer.

Instead, Buswest chose to order the bus without passenger seat belts at all. The Buswest sales manager in charge testified that, except for buses geared toward the health care industry, all buses he ordered for stock were without seat belts.

Starcraft manufactured the bus as ordered, and Buswest picked it up in Indiana and had it driven to California. The bus sat on Buswest's lot unsold for two years. Ultimately, Buswest sold the bus to TBE International, Inc., the tour company involved in this litigation. TBE had purchased several buses from Buswest over the years. Although both Buswest and TBE were located in California, they arranged for delivery of the bus in Las Vegas, so that TBE could obtain apportioned license plates, which enabled the bus to be used interstate.[2] When the bus was first registered, TBE obtained approval to operate the bus in California, Arizona, and Nevada. At the time of the accident, in 2010, the bus had a California apportioned license plate.

3.    *The Lawsuit*

Plaintiffs filed suit against Starcraft, Buswest, TBE and Lu, seeking damages for wrongful death and personal injuries. The operative pleading is the second amended complaint, which alleged causes of action for wrongful death, negligence, strict products liability, loss of consortium, and negligent infliction of emotional distress.[3]

In December 2012, TBE and Lu settled with plaintiffs for a payment of $5 million, in exchange for a full release of all claims against them.

---

[2]    This also enabled TBE to avoid paying California sales tax on the bus.

[3]    Apparently by mistake, the cause of action for strict products liability did not list Buswest as one of the defendants against whom it was asserted. There is no doubt, however, that the action proceeded as though the cause of action was alleged against Buswest.

4

4.      *The First Choice of Law Ruling*

One year after TBE and Lu had settled out of the case, Starcraft and Buswest filed a joint motion to apply the substantive law of Indiana to the case.  Neither party ultimately argued for Arizona (the site of the accident) law to apply, and on appeal, no party argues for application of Chinese (the residence of the plaintiffs) law.  The appeal thus squarely presents the question:  Should Indiana or California law govern?[4]  Starcraft and Buswest pointed out seven material ways in which Indiana law differs from California law, including the law of product defects, apportionment of damages among culpable defendants, and limitations on wrongful death damages for the loss of the decedent's love and companionship.  Acknowledging that California applies the governmental interest test in choice of law situations, Starcraft and Buswest argued that Indiana had a greater interest in the application of its law to this case than California had in the application of its law.  Specifically, Starcraft and Buswest argued that Indiana's products liability laws reflected its "strong interest in regulating manufacturing occurring with[in] its borders and protecting its residents from excessive financial burdens."  While this interest clearly applied to Starcraft, Buswest also argued that, because it had conducted business in Indiana, Indiana's interest in protecting businesses should extend to Buswest as well.  In contrast to the Indiana interest, Starcraft and Buswest argued that California had no interest in applying its more plaintiff-friendly laws, as the plaintiffs here were not California residents and the accident had not occurred in California.

_____

[4]     In passing, the original motion by Starcraft and Buswest had argued for the application of Arizona or Chinese law in the alternative to Indiana law.  However, at the hearing on the motion, Buswest argued against the application of Arizona law.  A California court will apply California law "unless a party litigant timely invokes the law of a foreign state." (*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581 (*Hurtado*).)

5

In opposition, plaintiffs acknowledged that California and Indiana law differed in the ways identified in the motion. But plaintiffs argued that California had an interest in the application of its laws because Buswest – a California dealer – had placed the bus in the stream of commerce in California. They argued that California had interests in discouraging its in-state dealerships from selling defective vehicles in California, preventing future harm to California residents, and providing compensation to foreign tourists who are injured in defective vehicles operated by California touring companies. Plaintiffs also argued that Indiana could not possibly have an interest in the application of its law, because, due to Indiana's use of *lex loci delicti* rules of choice of law, Indiana courts would apply Arizona law to this case.

In reply, Starcraft and Buswest argued that California's "lone interest in this case is its resident defendant, [Buswest], who would be harmed by the application of its laws." As Indiana had a strong interest in protecting its manufacturer (Starcraft), and California had no interest at all, Starcraft and Buswest argued Indiana law must govern.

On January 13, 2014, the trial court granted the motion, largely adopting the argument offered by Starcraft and Buswest. The court began by agreeing that Indiana and California law differ, with Indiana law being more protective of defendants. Turning to governmental interest analysis, the court identified three interests which could potentially be at stake: (1) a state's interest in compensating its injured residents; (2) a state's interest in deterring wrongful conduct within its borders; and (3) a state's interest in protecting its resident defendants from excessive damages. As between Indiana and California, the first interest did not apply, as plaintiffs were Chinese nationals. The second interest did not apply either, as the accident occurred in Arizona. The court concluded the third interest favored only Indiana, in that Indiana has an interest in applying its law to protect its resident defendant (Starcraft) and California's interest

6

is aligned, in that the application of Indiana law would also protect the California defendant (Buswest).

After the trial court's ruling, the case proceeded under Indiana law.[5] Twice, in passing (in opposition to Buswest's motion for summary judgment and in their trial brief), plaintiffs requested the court to reconsider its choice of law ruling. The court did not do so.

5.      *The Second Choice of Law Ruling*

In August 2014, eight months before trial, Starcraft settled with plaintiffs, for a total payment of $3,250,000, leaving Buswest as the sole defendant. In light of the dismissal of the only Indiana defendant, plaintiffs sought reconsideration of the trial court's decision to apply Indiana law, both in a brief regarding choice of law, and by means of a motion in limine. Plaintiffs argued that, in the absence of Starcraft, Indiana had no interest in the application of its law. They argued that, to the extent Indiana had a residual interest in encouraging the purchase of products from its residents, that interest was overwhelmed by California's interest in regulating the sale of defective products within its borders.

Buswest opposed the motion as an untimely motion for reconsideration dressed up as a motion in limine. Buswest argued that the court was correct in its initial determination that Indiana law applied, and the dismissal of Starcraft did not alter the ruling. Buswest again argued that California's only interest was the protection of its resident defendant, and that this interest would be furthered by the application of Indiana law, which is more favorable to defendants than California law. Buswest argued that California "has no interest in having its liability and damages laws applied to the detriment of its sole

---

[5]      In January 2014, plaintiffs filed a petition for writ of mandate, challenging the trial court's ruling that Indiana law applied. (*Chen et al. v. Superior Court*, B253966.) We denied the petition as plaintiffs had failed to demonstrate entitlement to extraordinary relief.

remaining interest in this case: its resident defendant [Buswest]." It further argued that Indiana's business-protective interest applied, even though Starcraft was no longer in the case, because Buswest itself had done business in Indiana by means of buying the bus there. Finally, Buswest argued – with no citation to authority – that granting the motion would "set a dangerous precedent moving forward in multi-defendant cases," with a possibility for reconsideration of choice of law whenever any defendant settled. Moreover, changing the applicable law this close to trial would be prejudicial.

By the time of the hearing, the case had been reassigned to a different judge. The new judge denied the motion. First, the court agreed with Buswest that plaintiffs' motion was not a proper motion in limine, and stated that it could "be denied on that basis alone." Second, the court agreed with Buswest that the motion did not meet the statutory prerequisites for a motion for reconsideration, and that it could therefore "be denied on that basis as well." The court recognized that plaintiffs had argued that the dismissal of Starcraft was a change in the facts, but the court concluded that the dismissal of Starcraft did "not change [the prior judge's] choice of law analysis in any way." Third, the court turned to the merits of the motion, and found that California had no interest in the case because the plaintiffs are not California residents and the accident did not occur in California. The court concluded that Indiana had an interest, because plaintiffs alleged the bus was negligently designed, and the bus was designed, manufactured, and sold in Indiana. Finally, the court agreed with Buswest that the applicable law should not change at the eleventh hour just because of Starcraft's settlement. "The parties have prepared for trial based on a definitive ruling by the previous judge. The parties should be able to rely on that ruling in their trial preparation. The happenstance of a change in parties should not affect the law to be applied here."

6.    *The Trial*

The case proceeded to trial under Indiana products liability law which, among other things, imports a negligence standard into the definition of a defective product.  Under Indiana law, a plaintiff can recover against the seller of a product placed in the stream of commerce in a defective condition unreasonably dangerous to any user.  (Ind. Code § 34-20-2-1.)  "However, in an action based on an alleged design defect in the product . . . , the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product . . . ."  (Ind. Code, § 34-20-2-2.)

At trial, plaintiffs' case focused on Buswest's decision to order the bus without lap belts.  Plaintiffs argued that the bus was unreasonably dangerous without $12 lap belts, which would have protected the passengers during the rollover accident.  Buswest did not argue that $12 was too much to spend on seatbelts; instead, it took the position that its decision not to include seatbelts constituted an exercise of reasonable care, based on three facts:  (1) federal National Highway Transportation Safety Administration standards did not require lap belts in this bus; (2) the industry standard was not to include seatbelts at the time; and (3) while lap belts would likely protect occupants in a rollover accident, lap belts could cause serious injuries to passengers in frontal collisions, which were much more common than rollover accidents.

A special verdict form was presented to the jury.  The jury concluded that Buswest was a manufacturer or seller of the bus under Indiana law.  However, it concluded that the bus was not in a "defective condition" at the time of the accident.  The jury was polled; its answer to the latter question was not unanimous, but by a vote of 10-2.  Judgment was entered in favor of Buswest. Plaintiffs filed a timely notice of appeal.

## DISCUSSION

Before discussing the specific issues in the case, we provide a brief overview of California conflicts of law.  Then, we consider

whether the trial court should have fully reconsidered the choice of law motion after Starcraft's settlement with plaintiffs. Concluding that it should have, we do not consider the propriety of the first choice of law ruling and instead consider de novo whether Indiana or California products liability law should apply to the action between the Chinese plaintiffs and the California defendant, Buswest. Considering the governmental interests at stake in this products liability case, we conclude that California has an interest in applying its laws, while Indiana does not. Therefore, the trial court erred in applying Indiana products liability law. Finally, we conclude that the error was prejudicial, in that it is reasonably probable that plaintiffs would have prevailed had California law been applied. We therefore reverse and remand for a new trial.

1.      *Choice of Law Rules in California*

Generally speaking, California courts will apply California substantive laws "unless a party litigant timely invokes the law of a foreign state. In such event he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it. [Citations.]" (*Hurtado, supra,* 11 Cal.3d at p. 581.) Thus, the starting point in our analysis is that a California court should apply California law unless there is a reason not to.

In 1967, our Supreme Court adopted the governmental interest test of conflicts of law. (*Reich v. Purcell* (1967) 67 Cal.2d 551, 555 (*Reich*).) " 'We typically summarize governmental interest analysis as involving three steps: "First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the

10

application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state' [citation], and then ultimately applies 'the law of the state whose interest would be the more impaired if its law were not applied.' " ' [Citation.] Because this is an issue of law, we review the trial court's decision de novo. [Citation.]" (*Scott v. Ford Motor Co.* (2014) 224 Cal.App.4th 1492, 1503 (*Scott*).)

We stress that the first element requires looking at the law of the potentially affected jurisdictions "with regard to the particular issue in question." (*Scott, supra,* 224 Cal.App.4th at p. 1503.) California follows the doctrine of dépeçage, under which different states' laws can be applied to different issues in the case. (*Smith v. Cimmet* (2011) 199 Cal.App.4th 1381, 1396 [" '[A] separate conflict of laws inquiry must be made with respect to each issue in the case. . . .' [Citation.]"]; see *Browne v. McDonnell Douglas Corp.* (N.D. Cal. 1980) 504 F.Supp. 514, 517, 519 (*Browne*) [applying California law on products liability and damages, but Yugoslavia law on allocating liability among multiple defendants].) Thus, the issue in this case is not whether California and Indiana laws are different in the abstract, but whether they are different with respect to the particular issues disputed in the case. A different governmental interest analysis must be performed with respect to each particular issue.

The second element of the test looks to each jurisdiction's interest in the application of its own law. Again, due to dépeçage, we must consider each state's interest behind its laws on each legal issue on which the states' laws disagree. Thus, for example, when considering whether to apply a jurisdiction's limitation on wrongful death damages, we consider the policies implicated by a limitation on wrongful death damages. (E.g., *Hurtado, supra,* 11 Cal.3d at p. 583.) But when considering whether to apply a jurisdiction's prohibition on punitive damages, we consider the somewhat different policies that are implicated by such a limitation. (E.g., *Scott, supra,* 224 Cal.App.4th at pp. 1504-1505.) The court must also consider the circumstances of the case in

11

determining any state's interest. (*McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, 90 (*McCann*).) The parties to the action are relevant to the determination of the jurisdictions' relative interests. In *Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711 (*Kasel*), the plaintiff, a California resident, was injured in Mexico by a defective shotgun shell manufactured in Mexico. In determining the governmental interests, the court stated, "Mexico is the place of manufacture, ultimate purchase, use of and injury by the defective shotgun shell. However, it is significant that no Mexican nationals are litigants in this action. The importance of these elements certainly diminishes when the only litigating parties are citizens of the United States . . . . " (*Id.* at p. 732, fn. omitted.) Based on these and other factors, the court of appeal upheld the trial court's application of California law. (*Id.* at pp. 728-739.)

If the interests of the foreign state "will not be significantly furthered by applying its law," any conflict is a false conflict, and forum law will prevail. (*American Bank of Commerce v. Corondoni* (1985) 169 Cal.App.3d 368, 372.) Assuming the existence of a true conflict between the states' laws and interests, the third element of governmental interest analysis looks to see which jurisdiction's interests would be more impaired if its policy were subordinated to the other jurisdiction's policy. (*McCann, supra,* 48 Cal.4th at pp. 96-97.) In conducting this evaluation, we do not "weigh" the conflicting interests in the sense of determining which law manifests the "better" or "worthier" social policy on the issue. Instead, we are determining the proper allocation of law-making power in a multi-state context – we determine the appropriate limitations of the reach of state policies. Emphasis is to be placed on the appropriate scope of conflicting state policies rather than the quality of those policies. (*Id.* at p. 97.)

2.    *Reconsideration of Choice of Law was Required*

The first issue we face is whether the trial court was correct in its alternative determination that plaintiffs could not obtain reconsideration of the initial choice of law ruling by means

of a motion of limine after Starcraft had settled. We conclude this determination was erroneous.

Procedurally speaking, it is important to recognize the nature of the trial court's initial choice of law ruling on the motion brought by Starcraft and Buswest. A motion to determine the law to be applied in a case is "the equivalent of an in limine motion that seeks to resolve a conflict of laws or choice of law issue." (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2004) 121 Cal.App.4th 490, 502.) In limine rulings are not binding; they are subject to reconsideration upon full information at trial. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 90, fn. 6.) Because by their very nature, motions in limine are subject to reconsideration at any time prior to the submission of the cause (*ibid.*), they are not subject to the formal constraints of a motion for reconsideration under Code of Civil Procedure section 1008. Buswest would characterize the ruling on its first motion as a binding determination of the law to be applied in the case, and plaintiffs' subsequent motion in limine as an untimely and procedurally improper attempt to obtain reconsideration of that ruling. But, in truth, the original motion brought by Buswest and Starcraft was simply an in limine motion, filed a year before trial, which could obtain nothing more than a non-binding ruling subject to reconsideration when the facts were fully developed at trial. (See *Kasel, supra,* 24 Cal.App.3d at pp. 721, 732 [trial was bifurcated with choice of law litigated first; unsuccessful party could have sought reconsideration if stronger evidence had been introduced in the second phase].)[6]

Substantively, this must be the case. Under dépeçage, choice of law is not an across-the-board determination, but one which is made issue-by-issue. Conflicts of law questions cannot properly be resolved until the actual issues are known. More importantly, identification of the governmental interests

---

[6] Even if plaintiffs were required to show "new facts," in order for the trial court to revisit the choice of law query, the Starcraft settlement was such a new fact.

13

implicated by the conflicting laws on any issue depend on the circumstances of the case – both the facts as they are developed at trial and the parties involved. In this case, it is the parties involved that are key. At the time Starcraft and Buswest originally moved for the application of Indiana law, California defendants TBE and Lu had already been dismissed from the case, so any interest California may have had in applying its law to *those* defendants was not at issue, and the trial court correctly did not consider those interests. Similarly, once Starcraft had been dismissed from the case, any interest Indiana had in applying its law to *Starcraft* was no longer at issue. The court was required to reconsider its choice of law analysis in the absence of the Indiana defendant.

In reaching this conclusion, we necessarily reject two arguments Buswest makes. First, Buswest notes that in *Reich, supra,* 67 Cal.2d 551, our Supreme Court held that facts occurring after the accident – in that case, the Ohio plaintiffs' relocation to California – had no affect on the choice of law analysis, as it would otherwise encourage forum-shopping. (*Id.* at pp. 555-556.) Buswest therefore argues that choice of law is itself fixed at the time of the accident. Buswest greatly overstates the effect of *Reich*. The Supreme Court simply held that the historical facts of the parties' residences were fixed at the time of the accident; it did not hold that the relevant state interests were. Indeed, the relevant state interests could not possibly be determined until it was known what parties would be sued. Suppose, for example, that the plaintiffs in this case believed the bus was not defective at all, and had sued only Lu for his negligent driving. In such a case, Indiana would have no interest at all, and the dispute would be between the application of California negligence law and Arizona negligence law. The relevant interests cannot be accurately determined until the defendants, and the theories of liability alleged against them, are known – things that are only known for certain as the case gets closer to trial.

14

Second, Buswest suggests that allowing plaintiffs to seek reconsideration of the choice of law ruling would promote gamesmanship. We think it unlikely that parties would settle, or hold up a potential settlement, based on the effects a settlement might have on the law to be applied when the remaining parties proceed to trial. In any event, the risk of gamesmanship only arose in this case because Buswest and Starcraft chose to seek a preliminary in limine ruling on choice of law 15 months before trial. Any prejudice arising from the parties' reliance on this ruling was due to their misunderstanding of the nature of a pretrial choice of law ruling, not from plaintiffs' proper attempt to redetermine the applicable law at the time of trial.

3.      *California Strict Products Liability Law Applies*

We turn to the application of the governmental interest test in this case. While the parties identified seven different areas in which California and Indiana law differed, there was only one which determined the defense verdict in this case: strict products liability.

A.      *Step One:  The Laws Differ*

The first question is whether the laws of the two jurisdictions differ. As noted above, Indiana law does not permit a plaintiff to recover for a defectively designed product unless the seller failed to exercise reasonable care in designing the product. (Ind. Code, § 34-20-2-2.) This is in marked contrast to California, as California law allows recovery for a defectively designed product even if the defendant used reasonable care. "[T]he fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, upon hindsight, the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 434 (*Baker*); see *Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 32.)

15

B.     *Step Two:  Determining the State Interests*

We turn to the second step in the governmental interest analysis, determining California's and Indiana's respective interests in the application of their laws of products liability.  In this regard, Buswest argues that we should consider the three possible governmental interests identified in the *Hurtado* case:  (1) a state's interest in compensating its injured residents; (2) a state's interest in deterring wrongful conduct within its borders; and (3) a state's interest in protecting its resident defendants from excessive damages.  (*Hurtado, supra,* 11 Cal.3d at p. 584.)  But these are not three governmental interests at issue in *every* choice of law case; they are simply the three interests that may be implicated by a state's limitation (or lack thereof) on wrongful death damages.  We are not concerned with a limitation on wrongful death damages; we are concerned with the law of products liability.[7]  Different issues are at stake.

In *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, the court faced the issue of whether California law provided for strict products liability as a basis of recovery in a wrongful death case.  In the course of its opinion, the court set forth both the *Hurtado* interests supporting California's wrongful death statute and the different set of interests supporting California's law of strict products liability.  (*Id.* at pp. 1185-1186.)  It is the latter set of interests that we must consider in determining which state's products liability law applies:  "The primary purpose of imposing strict products liability 'is to insure that the costs of injuries resulting from defective products are borne by the manufacturers

---

[7]     There is a distinction between Indiana law and California law on wrongful death damages.  When Starcraft and Buswest initially moved for the application of Indiana law, they noted that Indiana, unlike California, imposes a $300,000 cap on wrongful death damages that may be awarded for the loss of a decedent's love and companionship.  (Ind. Code § 34-23-1-2.)  As no damages were awarded in this case, the issue of which state's law regarding wrongful death damages should be applied is not before us.

that put such products on the market rather than by the injured persons who are powerless to protect themselves.' [Citation.] [¶] The other purposes, or public policies, behind the creation of the doctrine of strict products liability in tort as a theory of recovery are: '(1) to provide a "short cut" to liability where negligence may be present but difficult to prove; (2) to provide an economic incentive for improved product safety; (3) to induce the reallocation of resources toward safer products; and (4) to spread the risk of loss among all who use the product. [Citations.]' [Citation.]" (*Id.* at p. 1186.)

               1.     *California's Interests*

We consider whether the interests motivating California's adoption of strict products liability law would be enhanced by the application of California products liability law to this case, and frustrated by the imposition of Indiana law. The primary purpose of California's strict products liability law is to insure that the cost of injuries of defective products is borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. It is true that California has no interest in compensating injured plaintiffs who are neither injured in California nor California residents. (*Hurtado, supra,* 11 Cal.3d at p. 583.) But the policy behind strict products liability is greater than simple plaintiff compensation. For one, it implicates the public policy that the cost of defective products be borne by the manufacturers who put such products on the market. Buswest placed the bus on the market in California; California's policy interest is therefore implicated. The same is true with respect to three of the other four purposes behind California's adoption of strict products liability. While the first interest, to provide a "short cut" to liability where negligence may be present but difficult to prove, seems to relate only to plaintiffs and would therefore only apply to California resident plaintiffs, the other three are not so limited. The second interest is to provide an economic incentive for improved product safety; this clearly applies to a California dealership which orders products and has the option to include

17

safety devices in its orders. The third interest is to induce the reallocation of resources toward safer products; again, this applies to a California dealership that imports products, particularly when the dealership had the opportunity to order an allegedly non-defective product but chose not to do so. The fourth interest is to spread the risk of loss among all who use the product. This, too, applies to this case, as it would enable the risk of injuries on tour buses without seatbelts to be imposed on all users, via the cost of the product, rather than the injured plaintiffs alone. In short, California's interest in imposing its rules of strict products liability in this case, in which a California dealership ordered an allegedly defective product, imported it into the state, and sold it to a California tour company, for use on California roads, is strong.

2. *Indiana's Interests*

We turn to Indiana's interest in applying its more business-friendly products liability laws. Indiana apparently has chosen to balance the interests more in favor of manufacturers than injured plaintiffs. This is an interest which, initially, extends only to Indiana businesses, and does not apply when there are no Indiana defendants in the action. (*Hurtado, supra,* 11 Cal.3d at p. 583.) However, in some cases, a state's interest in protecting businesses within the state can extend to foreign businesses doing business in the state. "When a state adopts a rule of law limiting liability for commercial activity conducted within the state in order to provide what the state perceives is fair treatment to, and an appropriate incentive for, business enterprises, we believe that the state ordinarily has an interest in having that policy of limited liability applied to out-of-state companies that conduct business in the state, as well as to businesses incorporated or headquartered within the state. A state has a legitimate interest in attracting out-of-state companies to do business within the state, both to obtain tax and other revenue that such businesses may generate for the state, and to advance the opportunity of state residents to obtain employment and the products and services offered by out-of-state

18

companies. In the absence of any explicit indication that a jurisdiction's 'business friendly' statute or rule of law is intended to apply only to businesses incorporated or headquartered in that jurisdiction (or that have some other designated relationship with the state—for example, to those entities licensed by the state), as a practical and realistic matter the state's interest in having that law applied to the activities of out-of-state companies within the jurisdiction is equal to its interest in the application of the law to comparable activities engaged in by local businesses situated within the jurisdiction." (*McCann, supra,* 48 Cal.4th at pp. 91-92.)

Buswest takes the position that it falls within this rationale, in that it does business in Indiana. Buswest does not sell any products in Indiana; it does not provide goods or services there; it does not employ any Indiana residents. It simply buys a product in Indiana and distributes it in its home state of California. We are hard-pressed to conclude that Indiana has an interest in extending the favorable laws it has adopted for the benefit of local *sellers* to a foreign *buyer* who then resells the product in its home jurisdiction.

Buswest also argues that Indiana's interest in protecting its own businesses, including Starcraft, is still at issue even though Starcraft has settled. This is so, Buswest argues, because its dealership agreement has an express indemnity clause, under which Buswest may seek indemnity from Starcraft for damages it is required to pay plaintiffs. The short answer to this argument is dépeçage – whether Indiana law applies to a separate contractual indemnity action between Starcraft and Buswest has nothing to do with whether Indiana law applies to this products liability action between Buswest and plaintiffs. To the extent Buswest argues that Indiana has an interest in limiting Buswest's obligation to pay damages in tort only because Starcraft may subsequently be liable for the damages in contract, we disagree. No state's interests can reach that far.

In short, we conclude Buswest does not do business in Indiana; it simply buys a product manufactured there and

19

distributes it in other jurisdictions, where it does business. Starcraft, the Indiana manufacturer, has settled and is no longer a party. Indiana's interest in protecting its resident product manufacturers is not implicated by this case.[8]

### 3. *California Has No Interest in Protecting Buswest*

We take a moment to correct a misunderstanding of California law which appears to have infected the ruling in this case. Buswest had argued, and the trial court agreed, that California has an interest in protecting its resident defendants from paying damages, and that – as Indiana law was more favorable to defendants than California law – California therefore had an interest in applying Indiana law to limit the damages its residents defendant might have to pay. This view of the law appears to have arisen due to an oversimplification of the interests discussed in *Hurtado*.

As noted above, the *Hurtado* court found three interests potentially implicated in statutes governing wrongful death damages: (1) an interest in plaintiff compensation; (2) an interest in deterring wrongful conduct; and (3) an interest in limiting excessive damages. The court noted that these interests are "primarily local in character." (*Hurtado, supra,* 11 Cal.3d at p. 584.)

---

[8]     Because we conclude that Indiana has no interest in this case, we need not address plaintiffs' argument that Indiana has no stake because Indiana courts themselves would not apply Indiana law. There is a line of authority which holds that, in considering the relative states' interests, a court may consider whether the state itself would apply its own law. (E.g. *Forsyth v. Cessna Aircraft Company* (9th Cir. 1975) 520 F.2d 608, 612.) Plaintiffs argue that since Indiana would apply Arizona law, not Indiana law (*Rexroad v. Greenwood Motor Lines, Inc.* (Ind.Ct.App. 2015) 36 N.E.3d 1181, 1183-1184) to this accident, Indiana can have no interest in the application of its laws. Plaintiffs cite to no authority that has adopted this doctrine in California, and we do not address the issue.

Some cases have suggested that the interests *any* state has in *any* conflicts of law analysis are: (1) compensating resident plaintiffs; (2) deterring wrongful conduct within its borders; and (3) restricting the damages paid by resident defendants. (E.g., *Browne v. McDonnell Douglas Corp., supra,* 504 F.Supp. at p. 518 [the third *Hurtado* interest is "limitation of damages payable by a resident defendant," which interest would be impaired by imposing California law on a California defendant].) As noted above, we disagree with generalizing *Hurtado*'s interests outside the context of limitations on wrongful death damages. But, we also disagree with the idea that *Hurtado* held that California has an interest simply in limiting the damages California defendants must pay. *Hurtado* was concerned with statutory limitations on wrongful death damages. Mexico had such a limitation; California did not. (*Hurtado, supra,* 11 Cal.3d at p. 583.) This meant that, in its wrongful death law, Mexico had chosen the interest of protecting its resident defendants. (*Ibid.*) But as California does not limit wrongful death damages, California has chosen victim compensation and deterrence over defendant protection. (*Id.* at p. 584; *Barrett v. Superior Court, supra,* 222 Cal.App.3d at p. 1185.) In short, *Hurtado* itself illustrates that a state does not have an interest in protecting its resident defendants from damages in all circumstances. Instead, in applying the governmental interest test, a court must look at the law at issue and the interests each state has chosen to advance by its substantive law. That is the analysis we have performed, and it results in California having a strong interest in imposing its products liability law on a California defendant allegedly importing defective products for sale in California.

C.     *Step Three:  There is No True Conflict*

The third step of the analysis requires us to determine whether California's interests or Indiana's interests would be more impaired by the application of the other's law of products liability. As we have explained, California has a strong interest which would be impaired by the application of Indiana law in this

21

case, while Indiana has no interest.  There is therefore no true conflict, and California law should be applied.

Even if we were to have found a conflict, the result would be the same.  The weighing we conduct is not a balancing of which state's laws are better, but a determination of the appropriate limitations of the reach of state policies.  California's interests are in insuring manufacturers are liable for the harm they cause, providing an economic incentive for improved product safety, inducing the reallocation of resources toward safer products, and spreading the risk of harmful products.  Advancing these interests by imposing California law on Buswest, a California defendant which ordered the allegedly defective product, brought it into California, and sold it to a California tour company, for use in California (and elsewhere), would all be well within California's scope of authority.  In contrast, any interest of Indiana in limiting the scope of liability of Buswest for this conduct would be an unprecedented extension of Indiana law – allowing Indiana to permanently attach to any product manufactured in the state its restrictive views of products liability, regardless of resale.  California's interests would be more impaired by an application of Indiana law.  California law should therefore apply.

4.      *The Error was Prejudicial*

Finally, we turn to whether the error was prejudicial.  "A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' [Citation.]  When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

We conclude that the error was prejudicial.  Had the jury been instructed on California law, plaintiffs likely would have

22

proceeded under the risk-benefit theory of defective design.[9] Under that theory, a product is defective if "in light of the relevant factors discussed below, the benefits of the challenged design do not outweigh the risk of danger inherent in such design." (*Barker, supra,* 20 Cal.3d at p. 418.) "[A] jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]" (*Id*. at p. 431.) Moreover, once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden shifts to the defendant to prove, in light of the relevant factors, that the product is not defective. (*Ibid*.)

Having reviewed the record, we conclude this case presented a classic jury question for design defect under the risk-benefit analysis. It was virtually undisputed that lap belts were a simple, inexpensive safety feature which, if properly used, would have prevented the fatalities and other serious injuries suffered in this rollover accident. However, defendants presented evidence that lap belts would be unsafe in frontal collisions, which were much more common than rollovers. Federal authorities seemed split on the advisability of seatbelts in tour buses of this size. While the National Highway Safety Administration did not require them, the evidence showed that the National Traffic Safety Board supported mandatory

---

[9]    At one point in their conflicts briefing, plaintiffs mistakenly argued that Indiana law and California law were not in conflict, in that they both used the "consumer expectation" test to define a defective product. Buswest suggests that this argument was some sort of silent waiver of plaintiffs' right to pursue the alternative risk-benefit test should California law be applied in this case. We disagree. When plaintiffs proposed California jury instructions on strict products liability, they specifically included the risk-benefit instruction.

23

installation.  Faced with persuasive evidence on both sides, it is reasonably probable that a properly instructed jury would have found for plaintiffs.  Indeed, two of the twelve members of the jury thought the bus was defective even under Indiana law.

Buswest argues that there is no reasonable probability of a plaintiffs' verdict, because even under California law, it would still be able to introduce its persuasive evidence of compliance with industry custom and governmental standards.  But the California Supreme Court just granted review in a case presenting the issue of whether industry custom evidence is admissible in a risk-benefit case.  (*Kim et al. v. Toyota Motor Corporation* (2016) 243 Cal.App.4th 1366, review granted April 13, 2016, S232754.)  Moreover, even if the evidence were admitted, we do not find it as dispositive as Buswest would like, particularly given that the government itself disagreed over the risks and benefits of seatbelts in tour buses.

## DISPOSITION

The judgment is reversed and the matter remanded for a new trial governed by California products liability law.  Plaintiffs shall recover their costs on appeal.


RUBIN, ACTING P. J.

WE CONCUR:


GRIMES, J.



CHANEY, J. *

---

* Judge of Division One of the Second District Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.